## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

SOUTH CAROLINA STATE CONFERENCE OF
THE NAACP; MARVIN NEAL; ROBYNNE
CAMPBELL; DE'ONTAY WINCHESTER,

      *Plaintiffs*,

    v.

ALAN WILSON, in his official capacity as
Attorney General of South Carolina;

      *Defendant*.

Case No.: <u>2:23-cv-01121-DCN</u>

**Complaint for Declaratory and
Injunctive Relief**

### INTRODUCTION

1.    Every day, hundreds of tenants in South Carolina receive notice from their local magistrate's court that their landlord has initiated eviction proceedings against them. They have a short window to respond—only ten days to request a hearing before they default on the eviction action and lose their homes. The legal process is daunting and confusing for most tenants, and these tenants typically don't know where—or don't have anywhere—to turn for help. They are too poor to pay for a lawyer, and there are too few pro bono lawyers in South Carolina to provide them with free legal representation. As a result, the vast majority of tenants never get the legal help they need, fail to request a hearing, and are unable to exercise their legal rights in the eviction process. The consequences are devastating, adding up to an eviction crisis across the State of South Carolina.

2.    Plaintiffs in this case—the South Carolina State Conference of the National Association for the Advancement of Colored People (the "South Carolina NAACP"), which is

the oldest civil rights organization in South Carolina; Robynne Campbell; Marvin Neal; and De'Ontay Winchester—would like to provide guidance to help these tenants exercise their rights and stay in their homes.

3.     The South Carolina NAACP has developed a training program to equip and certify advocates like Ms. Campbell, Mr. Neal, and Mr. Winchester to provide some of the guidance that South Carolina tenants so desperately need. The program would train advocates to advise tenants that they should request a hearing on their eviction action; help tenants determine how and when to request that hearing; and, when appropriate, identify certain defenses the tenant might be able to raise. This free advice has been vetted by attorneys with expertise in housing law and is designed to be accurate, helpful, and complementary to existing legal services.

4.     Overall, the training program would help ensure that low-income South Carolinians understand and are able to exercise their legal rights and are therefore less likely to default on or avoidably lose their eviction actions.

5.     But South Carolina bars Plaintiffs from working together in this way to help tenants and mitigate the State's eviction crisis. The State's prohibition against the unauthorized practice of law makes it a felony for any person to "practice law . . . unless he is enrolled as a member of the South Carolina Bar."[1] In a series of sweeping decisions, the South Carolina Supreme Court has held that even extremely simple guidance about the law is considered legal advice that qualifies as the unauthorized practice of law, even if it is free and beneficial. The State regularly enforces its prohibition on the unauthorized practice of law, so Plaintiffs cannot

_____

[1] S.C. Code Ann. § 40-5-310 (2009).

provide the limited advice laid out in the South Carolina NAACP's training program without risking prosecution and severe criminal sanctions.

6.     Plaintiffs bring this action to ensure that they can provide the help that tenants in their communities need. No significant state interest is advanced by preventing Plaintiffs' provision of free, accurate, and limited legal advice to a population that currently has few legal services available to it. Instead, the prohibition restricts the assistance available to tenants and impairs Plaintiffs' rights to speak and associate to advocate for greater access to the courts, in violation of the First Amendment.

7.     This Court should declare that the application of South Carolina's unauthorized practice of law rules to Plaintiffs' proposed activities would violate the Constitution, and it should permanently enjoin South Carolina from enforcing its rules against Plaintiffs in such an unconstitutional manner.

## PARTIES

8.     Plaintiff South Carolina NAACP is a nonprofit, nonpartisan membership organization in South Carolina. The South Carolina NAACP has over 12,000 members and comprises nearly 50 branches across the State. The South Carolina NAACP was chartered in 1939 and is the oldest civil rights group in South Carolina.

9.     The South Carolina NAACP advocates to ensure that all people are able to exercise their rights and access the courts. Throughout its history, the South Carolina NAACP has used collective action to redress unjust housing conditions in South Carolina and create greater housing stability for low-income individuals, including by setting up eviction prevention services and advocacy campaigns.

10.     Moreover, the South Carolina NAACP has long been a leader in the fight for the very associational and expressive freedoms at issue in this action. The South Carolina NAACP brought one of the suits consolidated in the seminal *Brown v. Board of Education* ruling.[2] It was this ruling, and the South Carolina NAACP's role in bringing it about, that led South Carolina to join a number of southern states in passing new rules ostensibly governing the practice of law that were designed to make it harder for the NAACP to educate its members and bring desegregation cases.[3] When the Supreme Court ultimately concluded that analogous attorney practice rules in Virginia violated the First Amendment, it emphasized that the NAACP's legal work was vital to "vindicate the legal rights" of Black Americans and served as "a means for achieving the lawful objectives of equality of treatment."[4]

11.     Plaintiff Marvin Neal is the Third Vice President of the South Carolina NAACP. Until the start of this year, he was the President of the Georgetown Branch of the South Carolina NAACP. As part of his work on behalf of the Georgetown Branch and in his role as a community leader, Mr. Neal conducts outreach to low-income tenants and tries to help tenants who are facing eviction. Mr. Neal does everything he can to prevent evictions in his community, but he is not a lawyer, so he is careful to steer clear of providing anything that may be construed as legal advice because of South Carolina's broad ban on the unauthorized practice of law.

---

[2] *Briggs v. Elliott*, 103 F. Supp. 920 (E.D.S.C. 1952), *rev'd sub nom. Brown v. Bd. of Educ.*, 349 U.S. 294 (1955).

[3] 2 Race Rel. L. Rep. 854 (1957) (new barratry law); *see also* Walter F. Murphy, *The South Counterattacks: The Anti-NAACP Laws*, 12 W. Pol. Q. 371, 374 (1959).

[4] *NAACP v. Button*, 371 U.S. 415, 428–29 (1963) (holding ban on soliciting legal business could not be applied to NAACP's activities); *see also In re Primus*, 436 U.S. 412 (1978) (applying *Button* to South Carolina's practice of law rules).

12.     Plaintiff De'Ontay Winchester is the President of the Georgetown Branch of the South Carolina NAACP. Mr. Winchester is a licensed clinical social worker. In his work and in his volunteer efforts as an NAACP leader, Mr. Winchester has provided direct, nonlegal assistance to tenants who are facing eviction, but he avoids providing any advice that may be construed as the unauthorized practice of law under South Carolina's broad restriction.

13.     Plaintiff Robynne Campbell volunteers with the Columbia Branch of the South Carolina NAACP. She has received training to serve as a housing navigator, a position in which she helps low-income tenants by connecting them with rental assistance programs, referring them to legal services providers, and providing them with basic information about the eviction process. Ms. Campbell is also a trained mediator, and she often engages in court-watching. Ms. Campbell has herself previously faced eviction actions as a tenant. Like Mr. Neal and Mr. Winchester, she does everything she can to prevent unfair evictions, but she is careful not to share any information that could be construed as legal advice under South Carolina's broad prohibition on the unauthorized practice of law.

14.     Mr. Neal, Mr. Winchester, and Ms. Campbell are ready and eager to receive the South Carolina NAACP's training and serve as Housing Advocates, as soon as they receive assurance that they will not be prosecuted for the unauthorized practice of law.

15.     Defendant Alan Wilson is the Attorney General of the State of South Carolina. Attorney General Wilson bears official responsibility for the enforcement of South Carolina law, including the prohibition on the unauthorized practice of law. Because the injunctive relief sought by Plaintiffs would run against his office, Attorney General Wilson is named as a defendant in his official capacity.

## JURISDICTION AND VENUE

16.     Plaintiffs' claims are brought under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

17.     This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and § 1343. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

18.     Venue is proper in the United States District Court for the District of South Carolina under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts that gave rise to this lawsuit have occurred or will occur in this judicial district. This District is also an appropriate venue under 28 U.S.C. § 1391(b)(1) because Defendant resides in this judicial district.

19.     Venue is proper in the Charleston division under Local Rule 3.01 because a substantial portion of the events or omissions giving rise to the claims occurred in this division.

## FACTS

### A.    South Carolina tenants' urgent need for legal support

20.     South Carolina has one of the highest eviction rates in the country. According to court records, North Charleston has the highest eviction rate among large cities in the nation, and Columbia has the eighth highest.[5] In several counties in South Carolina, more than one out of ten tenants are evicted every year.[6] And at the state level, South Carolina's eviction rate is worse

---

[5] *Top Evicting Large Cities in the United States*, Eviction Lab, https://perma.cc/7HN5-DDUA (last visited Mar. 20, 2023).

[6] Braley Dodson, *South Carolina Eviction Laws Creating Power Imbalance Between Renters, Landlords*, WBTW News 13 (Apr. 12, 2022, 5:38 AM), https://perma.cc/JQ4K-RTQ6.

than that of every other state in the country except one.[7]

21.     Tenants who face eviction in South Carolina almost always do so alone and without legal representation. According to a report by the South Carolina Access to Justice Commission, landlords filed nearly 150,000 eviction actions in South Carolina in 2019. Tenants, the defendants in these actions, were unrepresented in more than 99% of these cases.[8]

22.     A number of factors contribute to the near-total inability of South Carolina tenants facing eviction proceedings to access legal counsel. Most acutely, tenants who face an eviction action are typically poor and unable to afford a lawyer. This is especially true for Black tenants in South Carolina, who are disproportionately low-income and overburdened by their rent.[9]

23.     South Carolina does not have enough legal services lawyers to provide free or low-cost legal services to tenants with legal needs.

24.     For example, despite the around-the-clock efforts of the lawyers at South Carolina Legal Services—South Carolina's only statewide legal services provider and a longstanding partner of the South Carolina NAACP—capacity constraints forced South Carolina Legal Services to turn away an average of more than 2,000 people each year between 2017 and 2019.[10] There simply are not enough legal aid lawyers to meet the demand.

25.     Overall, according to data compiled by the National Center for Access to Justice, South Carolina has one of the worst access-to-justice scores in the country.[11]

---

[7] *National Eviction Map*, Eviction Lab, https://perma.cc/72BA-MTBR (last visited Mar. 20, 2023).
[8] Elizabeth Chambliss et al., S.C. Access to Just., *Measuring South Carolina's Justice Gap* 5 (2021), https://perma.cc/BR8P-9JX4.
[9] *See, e.g.*, Dodson, *supra* note 6.
[10] Chambliss et al., *supra* note 8.
[11] Nat'l Ctr. for Access to Just., *Justice Index*, https://perma.cc/K3AR-XVXF (last visited Mar. 20, 2023).

26.     The comprehensive February 2023 South Carolina Statewide Legal Needs Assessment, commissioned by the South Carolina Access to Justice Commission, the South Carolina Bar, and the NMRS Center on Professionalism at the University of South Carolina School of Law, was issued in response to concerns about "people's dire need for legal help, and the gap between the needs and the resources available to assist them."[12] One of its key conclusions put it simply: "There are too many people in need of civil legal services and not enough services to go around."[13] This gap between legal need and available services is most acute in the area of housing law, especially for tenants facing eviction.[14]

27.     In South Carolina, the consequences of not having access to legal representation are immediate and severe for many tenants.

28.     South Carolina has an extremely cheap and fast formal eviction process. Filing for an eviction in South Carolina costs $40—nearly one-third the national average of $112.[15]

29.     Under South Carolina law, once a landlord files to evict a tenant, the local magistrate—the presiding judge in most South Carolina eviction actions—must immediately issue what is commonly called a "rule to vacate or show cause" order: a notice to the tenant that requires "the tenant forthwith to vacate the premises occupied by him or to show cause why he should not be ejected before the magistrate within ten days after service of a copy of such rule upon the tenant."[16]

---

[12] Bruce Rich et al., Univ. N.C. Greensboro, *South Carolina Legal Needs Assessment 2022* 3–4 (2023), https://perma.cc/WU9J-KB54.
[13] *Id.* at 3.
[14] *Id.* at 5–6, 25.
[15] Lillian Leung et al., *Serial Eviction Filing: Civil Courts, Property Management, and the Threat of Displacement*, 100 Soc. Forces 316, 334 (2020).
[16] S.C. Code Ann. § 27-37-20 (1976).

30.    Unlike many states where tenants are automatically afforded an opportunity to contest an eviction action in court, tenants in South Carolina forfeit their opportunity to make their case if they do not affirmatively request a hearing within ten days.[17]

31.    If a tenant fails to request a hearing within that time period, the tenant defaults on the eviction action, and "the magistrate shall issue a warrant of ejectment and the tenant shall be ejected by his regular or special constable or by the sheriff of the county."[18]

32.    As many as 90% of tenants default by failing to request a hearing after their landlord files an eviction action.[19] In other words, every year, thousands of tenants forfeit their legal rights and lose their homes without any further process by failing to act within ten days. This high rate of default occurs even though tenants can usually obtain a hearing on their eviction action just by calling their local magistrate court and requesting one.

33.    Some tenants either do not know that they must request a hearing or do not understand how to do so. Low-income tenants are often unfamiliar with the legal system; many face language barriers or have low levels of literacy.[20] The formal court notice they receive contains phrases and words that they may not understand. And the order—telling them that they are on the precipice of losing their housing—almost certainly causes anxiety about the risks they

---

[17] *Id.*

[18] S.C. Code Ann. § 27-37-40 (1976).

[19] *See* Thad Moore, *SC's Only Major Attempt to Fix North Charleston's Eviction Crisis Isn't Enough*, Post & Courier (Feb. 8, 2023), https://perma.cc/VS45-T9BB (noting that, before a pilot program, tenants requested hearings in "fewer than a tenth of eviction filings" in one court).

[20] *See* Mekonnen Firew Ayano, *Tenants Without Rights: Situating the Experiences of New Immigrants in the U.S. Low-Income Housing Market*, 28 Geo. J. on Poverty L. & Pol'y 159, 189 (2021) ("Even in standard tenancies, low-income tenants burdened with little education or language barriers are often uninformed of their rights, and so suffer numerous abuses at the hands of their landlords."); *see also* Judiciary Comm., Conn. Gen. Assembly, *Report of the Task Force to Improve Access to Legal Counsel in Civil Matters* 12 (2016), https://perma.cc/3A67-MSUJ.

face.

34.    Even if they are aware they should request a hearing, many tenants do not know what to do after they request a hearing. They are often unfamiliar with what defenses are available to them.

35.    Many tenants *do* have winning cases. Landlords often fail to provide proper notice to the tenant to terminate the tenant's lease; they fail to maintain habitable housing; and they mistakenly or even fraudulently claim that their tenants owe rent that the tenants have already paid.

36.    Even without legal representation, there are simple, effective ways that tenants can prevail on these defenses if they can get into court. Tenants can, for example, demonstrate that their landlords did not provide them with proper notice because, in most cases, South Carolina law requires landlords to give tenants written notice before they try to evict their tenants.

37.    There are no legal disadvantages for tenants who exercise their rights and request a hearing, and requesting a hearing may also help tenants resolve their problems outside of court. Requesting a hearing typically slows down the fast-moving eviction process by a week or two, which may give tenants a crucial opportunity to come up with back-owed rent, negotiate with their landlord, or find adequate alternative housing. This added time also gives tenants a greater opportunity to find and receive legal representation from lawyers who can help these tenants contest their cases.

38.    South Carolina tenants' inability to receive the assistance they need to access the courts and exercise their rights has severe consequences not only for each of these tenants but also for their communities and for South Carolina more broadly.

39.     Evictions trigger a cascade of negative consequences, ranging from mental health problems,[21] to diminished employment opportunities for adults,[22] to educational disruptions for children.[23] And having an eviction record makes it even harder to obtain housing moving forward, as landlords may reject applicants based on previous eviction filings.[24]

40.     The high rates of eviction in South Carolina consolidate poverty and strain community and neighborhood resources.

41.     The effects of eviction actions and evictions are particularly consequential for Black renters, who are disproportionately low-income and more likely to be the subjects of eviction actions and to be evicted.[25] Studies from other parts of the country have shown that Black women, in particular, face extremely high rates of eviction.[26] The concentration of evictions in Black neighborhoods is just one legacy of discriminatory housing policies, such as redlining, that have historically excluded Black Americans from home ownership.[27]

42.     These imbalances create an urgent problem—for the tenants who are unable to access the courts and exercise their rights, for the communities they live in, and, overall, for

---

[21] *See* Hugo Vasquez-Vera et al., *The Threat of Home Eviction and Its Effects on Health Through the Equity Lens: A Systematic Review*, 175 Soc. Sci. & Med. 199, 199–208 (2017).

[22] *See* Matthew Desmond & Carl Gershenson, *Housing and Employment Insecurity Among the Working Poor*, 63 Soc. Probs. 46, 46–67 (2016).

[23] *See* Kathleen Ziol-Guest & Ariel Kalil, *Frequent Moves in Childhood Can Affect Later Earnings, Work, and Education*, MacArthur Found. (Mar. 2014), https://perma.cc/HB45-SJBS.

[24] *See* ACLU, *No Eviction Without Representation: Evictions' Disproportionate Harms and the Right to Counsel* 3–4, https://perma.cc/UH3Z-6ZLU.

[25] *See* Peter Hepburn et al., *Racial and Gender Disparities Among Evicted Americans*, 7 Socio. Sci. 649, 653 (2020).

[26] Matthew Desmond, *Eviction and the Reproduction of Urban Poverty*, 118 Am. J. Socio. 88, 121 (2012) (explaining that eviction and incarceration operate in tandem—as "[B]lack men are *locked up* while [B]lack women are *locked out*—to propagate economic disadvantage and social suffering in America's urban centers").

[27] *See* Max Blau, *Black Southerners Are Bearing the Brunt of America's Eviction Epidemic*, Stateline (Jan. 18, 2019), https://perma.cc/39DS-KEX9.

South Carolina's civil legal system, which is rendered less fair and just. This systemic failing is a particularly harsh example of what scholars, service providers, and policymakers have called a civil justice crisis around the country.

**B.    Plaintiffs are ready to provide free, accurate, and limited advice to tenants to help them respond to their eviction actions**

43.    Plaintiffs are willing and able to provide limited but highly valuable assistance to tenants who face eviction actions, and to help these tenants access the courts and respond to these actions. These tenants are often the members or constituents whom the South Carolina NAACP represents and serves. For Mr. Neal, Ms. Campbell, and Mr. Winchester, many are friends or neighbors. But South Carolina law prevents Plaintiffs from helping.

44.    Plaintiffs want to provide tenants in South Carolina who face an eviction action with free, accurate, and limited advice that would be construed under South Carolina law as the unauthorized practice of law. The South Carolina NAACP has prepared a carefully crafted certification program for volunteers, including Mr. Neal, Ms. Campbell, and Mr. Winchester, to provide this advice. The program is designed to ensure that low-income South Carolinians better understand their rights, are able to request a hearing on their eviction action, and, when appropriate, can effectively raise defenses related to the landlord's provision of notice and other limited issues.

45.    The South Carolina NAACP would train and certify advocates to: (1) confirm that the tenant they are helping has an eviction action filed against them; (2) advise the tenant that they should request a hearing and, based on the text of the eviction notice and checking relevant court records, explain how and when to do so; and (3) provide the tenant with narrow additional

advice about the hearing by flagging certain defenses the tenant might be able to raise.[28] The advocates also would be trained to make clear that they are providing only limited legal guidance and that they cannot represent tenants in court proceedings.

46.    By providing limited legal guidance—how to request a hearing, when to request a hearing, and potential defenses to raise at that hearing—Plaintiffs strive to create greater housing stability for low-income tenants and help reduce the number of unnecessary or wrongful evictions. Even in cases where they ultimately would not be able to prevent an eviction, Plaintiffs would help tenants gain time to figure out their rights and arrange alternative housing possibilities by ensuring that tenants know to, and know how to, request a hearing on their eviction action and avoid defaulting.

47.    Plaintiffs also seek to improve the integrity and fairness of the civil legal system in their communities. Because low-income tenants so rarely contest their eviction actions, many are unjustly or unnecessarily evicted, typically without ever getting their day in court. By providing accurate and limited legal guidance, Plaintiffs can help guarantee that otherwise unrepresented tenants at least have a chance to appear in court and have their claims heard.

48.    The South Carolina NAACP has prepared a detailed training plan to ensure that the advice its certified advocates give is accurate and sufficiently straightforward for a nonlawyer to provide, while still broadly helpful to many tenants facing eviction. In drafting the training, representatives of the South Carolina NAACP consulted with legal services providers in South Carolina. The Deputy Director of South Carolina Legal Services, who formerly led the organization's housing division, has reviewed the training to confirm that it is accurate and

---

[28] *See* Housing Advocate Training, attached as Exhibit A to this Complaint.

helpful.

49.     The training also ensures that certified advocates do not provide legal advice or legal services that go beyond their training. To receive their certification, South Carolina NAACP members and advocates must sign a form attesting to the fact that they will provide only the limited legal guidance they have been trained to provide. They also must agree to keep tenants' information confidential, to refuse any payment for the help they provide, and to check for conflicts of interest before providing any advice.

50.     Similarly, each tenant who requests assistance from a certified nonlawyer will be required to confirm that they understand the nature and limited scope of the advice they are receiving and that they will report any issues or concerns to the South Carolina NAACP. The South Carolina NAACP will follow up with tenants to assess outcomes and ensure that the advice they received was helpful and accurate.

51.     Providing this advice would not replace efforts to help tenants seek legal representation. If anything, it would increase access to lawyers. The training is designed to complement legal services. Helping tenants maximize the time they have before being evicted increases tenants' opportunities to receive legal representation before it is too late. And, as a part of their training, the South Carolina NAACP's members and advocates will be instructed to help tenants sign up for free legal help from South Carolina Legal Services or other low- or pro-bono law firms.

52.     Providing this limited legal advice to individuals facing eviction also would complement the nonlegal assistance and advice Plaintiffs already offer tenants.

53.     The South Carolina NAACP runs a variety of programs directed specifically at preventing evictions. In Columbia, South Carolina, the South Carolina NAACP helps run a

housing navigator program that connects low-income tenants who are experiencing housing issues with legal and nonlegal services. Housing navigators, who are, with few exceptions, nonlawyer community volunteers, are trained to provide tenants with information about the eviction process, to help tenants sign up for rental assistance programs and financial benefits, and to refer individuals with legal needs to South Carolina Legal Services. Ms. Campbell is one of the program's navigators. She has worked with several tenants, helping connect them to various financial assistance programs and explaining the eviction process to them.

54.    In the second half of 2022, the South Carolina NAACP and its branches also operated a program around the State aimed at preventing evictions by helping eligible renters sign up for South Carolina's emergency rental assistance program and connecting those facing eviction with legal services. The South Carolina NAACP trained its leaders to host pop-up clinics and hired and trained housing navigators to work directly with tenants. The program assisted more than 3,000 tenants in South Carolina. The South Carolina NAACP has continued this work by helping its branches provide support for these tenants while they await additional rental assistance. Mr. Neal and Mr. Winchester have participated in the South Carolina NAACP's efforts as volunteers by helping to run pop-up clinics at their branch in Georgetown, South Carolina.

55.    With more tenants losing their homes each month, the South Carolina NAACP urgently seeks to provide its training in order to stem the tide of unnecessary evictions. The South Carolina NAACP would immediately begin recruiting and training advocates, including Mr. Neal, Ms. Campbell, and Mr. Winchester. If they were allowed to participate, Mr. Neal, Ms. Campbell, and Mr. Winchester would immediately enroll in the training program and begin providing this advice to the tenants whom the South Carolina NAACP serves.

**C.     South Carolina's prohibition on the unauthorized practice of law unnecessarily prevents Plaintiffs from providing this limited legal advice**

56.     The only thing preventing Plaintiffs from providing greater assistance to tenants facing eviction is South Carolina's sweeping prohibition on the unauthorized practice of law.

57.     South Carolina law bars any person from engaging in the practice of law "unless he is enrolled as a member of the South Carolina Bar."[29] Unlike many other states, South Carolina has defined its prohibition on the unauthorized practice of law solely through a series of case-by-case adjudications. These decisions have taken a broad approach to the question of what qualifies as the practice of law, precluding nonlawyers from communicating even basic, relevant advice about the law to individuals to assist them in protecting their rights. For example, the South Carolina Supreme Court has said that conducting presentations on the law and answering questions posed by the general public,[30] referring someone to particular legal language,[31] or offering even "a few words of explanation" to help someone understand a document[32] qualifies as the practice of law.

58.     Also unlike many other states, South Carolina's unauthorized practice of law statute makes it a felony punishable by up to five years of imprisonment for a nonlawyer to practice law.[33] So long as the South Carolina Supreme Court has defined "the type of conduct" at issue as the unauthorized practice of law, the State can bring felony charges.[34] In South Carolina, the prohibition on the unauthorized practice of law is regularly enforced.

---

[29] S.C. Code Ann. § 40-5-310 (2009).
[30] *E.g.*, *Doe v. Condon*, 532 S.E.2d 879, 880 (S.C. 2000).
[31] *Linder v. Ins. Claims Consultants, Inc.*, 560 S.E.2d 612, 622 (S.C. 2002).
[32] *State v. Buyers Serv. Co.*, 357 S.E.2d 15, 19 (S.C. 1987).
[33] S.C. Code Ann. § 40-5-310 (2009).
[34] *Id.*

59.    Plaintiffs understand that they would violate South Carolina's prohibition on the unauthorized practice of law by providing any advice to individual tenants about how these tenants should respond to their eviction actions.

60.    Were the South Carolina NAACP to begin training its members and advocates to become certified to provide limited legal guidance to tenants, the South Carolina NAACP would face the prospect of immediate criminal prosecution. And, because they are not lawyers, Mr. Neal, Ms. Campbell, and Mr. Winchester would similarly risk immediate prosecution as soon as they started helping tenants by providing that limited legal advice.

61.    The threat of prosecution or other repercussions under South Carolina's blanket prohibition on the unauthorized practice of law chills Plaintiffs and prevents them from providing tenants facing eviction with the basic help these tenants so desperately need.

62.    Because of this prohibition, the South Carolina NAACP does not currently allow its volunteers to provide even limited legal guidance. Instead, the South Carolina NAACP trains nonlawyers like Mr. Neal, Ms. Campbell, and Mr. Winchester to provide tenants with general information about the eviction process in South Carolina. They cannot tell tenants whether or when they should request a hearing, or what they should do in response to an eviction action.

63.    Mr. Neal, Ms. Campbell, and Mr. Winchester have all observed on multiple occasions tenants facing eviction who did not understand their legal rights and did not understand how or why to request a hearing. But they knew that South Carolina law prohibited them from giving these tenants the basic advice they needed.

64.    This limitation on providing even basic suggestions to tenants disrupts Plaintiffs' ability to assist South Carolinians in asserting their rights.  All told, the broad reach of South Carolina's prohibition on the unauthorized practice of law prevents Plaintiffs from providing

helpful and accurate advice and from working together to prevent evictions.

**D.**  **Preventing Plaintiffs from providing this limited legal advice does nothing to protect the public and actively disserves South Carolina tenants facing eviction**

65.    By prohibiting Plaintiffs from coming together with tenants to have conversations that would help those tenants understand and assert their legal rights, South Carolina is restricting association and speech protected by the First Amendment.

66.    Restricting Plaintiffs' ability to train nonlawyers to provide limited, accurate, and free advice does not advance the State's interests. It harms South Carolina residents by preventing them from receiving the advice they need to access the courts and exercise their rights.

67.    South Carolina's prohibition of the "type of conduct" involved in Plaintiffs' activities—i.e., nonlawyers advising individual members of the public on their legal rights outside of court—stands in sharp contrast to the State's allowance of conduct that requires far more legal expertise from nonlawyers in other contexts.

68.    For example, in certain circumstances, nonlawyer law enforcement officers in South Carolina may *prosecute* individual cases.[35]

69.    Even more strikingly, magistrates—the judges who actually review and adjudicate eviction actions—do not need to be lawyers. Indeed, a majority of them are not.[36] So Plaintiffs cannot provide tenants with limited legal advice to help them access the courts, but a nonlawyer may adjudicate their case and order them evicted.

---

[35] *See In re Unauthorized Prac. of L. Rules Proposed by S.C. Bar*, 422 S.E.2d 123, 125 (S.C. 1992).

[36] Christel Purvis, *Should I Stay or Should I Go? South Carolina's Nonlawyer Judges*, 73 S.C. L. Rev. 1145, 1146 (2022).

70.     Moreover, other States allow nonlawyers to provide legal help in similar contexts. Indeed, "[f]rom the founding of the Colonies until today nonlawyers have participated with lawyers in the giving of advice and assistance to others on matters involving the law."[37]

71.     In Delaware and New York, for example, nonlawyers are allowed to provide tenants who are facing eviction with legal advice and assistance that goes far beyond the guidance Plaintiffs seek to provide. In Delaware, the state's supreme court has authorized nonlawyer employees of Delaware's legal services providers to act as "Qualified Tenant Advocates" and represent tenants in eviction actions.[38] As a part of their work, these Qualified Tenant Advocates are broadly authorized to "engage in such activities as are necessary or appropriate to prosecute or defend the action, including but not limited to providing advice regarding defenses" and even appearing in court.[39]

72.     New York City similarly allows trained nonlawyers to act as navigators and assist "unrepresented litigants in the City's Housing and Civil Courts" by providing these litigants with information, assisting them in "accessing and completing court-required simplified forms," attending settlement negotiations, and even responding to questions from judges.[40] According to a comprehensive evaluation of New York City's navigator program, "assistance from appropriately trained and supervised individuals without formal legal training is associated with changes in a range of outcomes, including both legal and real-life outcomes," like an increase in litigants asserting valid defenses and a greater share of litigants feeling as if "they were able to

---

[37] ABA, *Nonlawyer Activity in Law-Related Situations: A Report with Recommendations* 1 (1995).
[38] Del. Sup. Ct. R. 57.1.
[39] *Id.*
[40] Rebecca L. Sandefur & Thomas M. Clarke, Pub. Welfare Found., *Roles Beyond Lawyers* 3 (2016), https://perma.cc/C24N-PC4P.

tell their side of the story."[41] By making the legal process more accessible to unrepresented litigants, programs like this one are likely to increase faith in the justice system.

73.     Thousands of nonlawyers also provide a range of legal services to individuals who are involved in federal agency proceedings.[42] These nonlawyers help individuals with administrative filings, provide counsel, and even appear before administrative judges.

74.     The staggering amount of unmet legal need, including and especially for unrepresented tenants facing eviction, has led groups like the American Bar Foundation and the American Academy of Arts and Sciences to call for allowing nonlawyers to help individuals with legal problems by providing free, accurate, and carefully limited legal advice—just what Plaintiffs wish to do.

75.     In fact, the first recommendation of a recent report from the American Academy of Arts and Sciences is to "[d]edicate a consequential infusion of financial and human resources to closing the civil justice gap, and seek a significant shift in mindset—extending beyond lawyers the duty and capacity to assist those with legal need—to make genuine strides toward 'justice for all.'"[43]

76.     As the report recognized, "because lawyers alone will not be able to solve the crisis in civil justice, they should not be the only professionals allowed to provide information, assistance, and advocacy. With appropriate training and support, people without law degrees can

---

[41] *Id*. at 4.
[42] *See Sperry v. Florida ex rel. Fla. Bar*, 373 U.S. 379, 404 (1963) (holding that states cannot restrict the practice of law by nonlawyers before federal agencies where such practice is authorized by federal law); *see also* U.S. Dep't of Just., Comment Letter on Policy Recommendations Proposed by North Carolina Justice for All Project (Feb. 14, 2023), https://perma.cc/7TEW-Z83V.
[43] Am. Acad. Arts & Scis., *Civil Justice for All* 10 (2020), https://perma.cc/6T3U-NQ5Y.

help to assist tens of thousands of people facing eviction, food insecurity, job loss, domestic violence, and other serious problems."[44]

77.    Plaintiffs—who already provide nonlegal advice to prevent evictions by, for example, helping tenants sign up for rental assistance—can step into this gap and help prevent evictions by providing friends, neighbors, and members of their communities with accurate and limited legal advice about how to respond to an eviction action.

78.    Accordingly, Plaintiffs bring this action to ensure that they may exercise their rights to associate and share information to prevent unnecessary evictions and redress injustices in South Carolina's legal system.

## CAUSES OF ACTION

### Count I

Free Speech (42 U.S.C. § 1983)

79.    Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully here.

80.    The First Amendment's free speech clause, which applies to the states through the Fourteenth Amendment, prohibits the government from "abridging the freedom of speech."  U.S. Const. amend. I.

81.    This means that South Carolina "generally 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'"  *Barr v. Am. Ass'n of Pol.*

---

[44] *Id.*

21

*Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (plurality opinion) (quoting *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972)).

82.     The limited legal advice that Plaintiffs wish to provide is protected speech. *See, e.g.*, *Holder v. Humanitarian L. Project*, 561 U.S. 1, 27 (2010) (classifying "advice derived from 'specialized knowledge,'" including advice on legal matters, as speech); *NAACP v. Button*, 371 U.S. 415, 428–29 (1963) (holding that NAACP lawyers advising individuals to bring suit were engaged in "modes of expression . . . which [the State] may not prohibit, under its power to regulate the legal profession"). By prohibiting Plaintiffs from communicating that advice, South Carolina is regulating "speech as speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2373–74 (2018) (internal quotation marks omitted).

83.     Here, South Carolina's application of its prohibition on the unauthorized practice of law would impede Plaintiffs' right to free expression by criminalizing accurate, non-commercial speech that would advance Plaintiffs' goal of preventing unjust evictions.

84.     With respect to Plaintiffs' proposed speech, South Carolina's broad prohibition does not advance an adequate state interest with sufficient precision to withstand constitutional scrutiny.

85.     Instead, the application of South Carolina's unauthorized practice of law rules to outlaw Plaintiffs' proposed speech serves only to "prohibit[] speech and expression upon which courts must depend for the proper exercise of judicial power." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001). Plaintiffs are harmed by the denial of their First Amendment rights, and tenants facing eviction are harmed by the denial of access to the free and accurate legal advice that could help them access the courts.

**Count II**

Freedom of Association (42 U.S.C. § 1983)

86.    Plaintiffs incorporate by reference every allegation in the preceding paragraphs as if set forth fully here.

87.    The First Amendment's protection of the freedom of association, which applies to the states through the Fourteenth Amendment, covers "cooperative, organizational activity" in which organizations and individuals use "lawful means to achieve legitimate political ends." *Button*, 371 U.S. at 430 (1963).

88.    Associating with others to help individuals exercise their rights and petition the government is protected by the freedom of association. The Supreme Court has specifically held that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *In re Primus*, 436 U.S. 412, 426 (1978) (quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971)).

89.    As applied to Plaintiffs, South Carolina's prohibition on the unauthorized practice of law—interpreted by the South Carolina Supreme Court to prohibit nonlawyers from providing even the most basic legal advice—prevents Plaintiffs from using collective action to provide tenants with valuable advice about their legal rights and ensure they have meaningful access to South Carolina's courts in their eviction proceedings.

90.    South Carolina's broad prohibition impedes Plaintiffs' right to associate. With respect to Plaintiffs' proposed association, the prohibition does not advance an adequate state interest with sufficient precision to withstand constitutional scrutiny.  As the Supreme Court has previously instructed South Carolina, "broad rules framed to protect the public and to preserve respect for the administration of justice must not work a significant impairment of the value of

associational freedoms." *In re Primus*, 436 U.S. at 426 (citation and internal quotation marks omitted).

91.    Instead of furthering a state interest, South Carolina's prohibition here harms the public by preventing Plaintiffs from providing accurate and helpful advice that would allow more people to vindicate their rights and meaningfully access the courts.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in their favor and:

1) Declare that the application of South Carolina's unauthorized practice of law prohibition to Plaintiffs' activities violates Plaintiffs' expressive and associational rights under the First and Fourteenth Amendments.

2) Issue a preliminary and permanent injunction enjoining Defendants—including their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction—from taking any action that would prevent Plaintiffs from providing the free, accurate, and limited legal advice described herein.

3) Award Plaintiffs reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

4) Grant Plaintiffs such other relief the Court deems just and proper.

Respectfully submitted,

**WYCHE, P.A.**

*/s/ James E. Cox, Jr.*
James E. Cox, Jr. (D.S.C. I.D. No. 13054)
200 E. Broad St., Suite 400
Post Office Box 728
Greenville, SC  29602-0728
Direct Dial: 864-242-8212
Telecopier:  864-235-8900

E-Mail: jcox@wyche.com

Glynnis Hagins*
Joe Schottenfeld*
NAACP
4805 Mt. Hope Drive
Baltimore, MD 21215
Tel: (410) 580-5777
ghagins@naacpnet.org
jschottenfeld@naacpnet.org

Elise M. Baranouski*
Joseph W. Mead*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
    AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
(202) 661-6728
eb1326@georgetown.edu
jm3468@georgetown.edu

Ben Gifford*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
    AND PROTECTION
Georgetown University Law Center
PO Box 211178
Brooklyn, NY 11221
(202) 661-6728
bg720@georgetown.edu

*Attorneys for Plaintiffs*


*Application for admission pro hac vice
forthcoming*

Dated: March 21, 2023