**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| SOUTH CAROLINA STATE CONFERENCE )<br>OF THE NAACP, MARVIN NEAL, )<br>ROBYNNE CAMPBELL, and DE'ONTAY )<br>WINCHESTER, )<br>　　　　　　　　　　　　　　　　　　)<br>　　　　　　　　　Plaintiffs, 　　　　)<br>　　　　　　　　　　　　　　　　　　)<br>vs. 　　　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　　　)<br>ALAN WILSON, *in his official capacity as* )<br>*Attorney General of South Carolina*, 　　)<br>　　　　　　　　　　　　　　　　　　)<br>　　　　　　　　　Defendant. 　　　　)<br>_____) | No. 2:23-cv-01121-DCN<br><br>**ORDER** |

      This matter is before the court on plaintiffs South Carolina State Conference of the NAACP (the "South Carolina NAACP"), Marvin Neal ("Neal"), Robynne Campbell ("Campbell"), and De'Ontay Winchester's ("Winchester") (collectively, "plaintiffs") motion for a preliminary injunction, ECF No. 4, and defendant Alan Wilson's ("Wilson") motion to dismiss or stay, ECF No. 35. For the reasons set forth below, the court denies Wilson's motion to dismiss, grants Wilson's motion to stay, and finds plaintiffs' motion for preliminary injunction to be moot.

## I.  BACKGROUND

      South Carolina has among the highest eviction rates in the entire country. Of the 100 rural and small cities in the United States with the highest eviction rates, forty-seven

1

are in South Carolina.[1]  Of the twenty counties with the highest eviction rates, twelve are counties in South Carolina.[2]

Community leaders and advocacy groups have offered several solutions, the vast majority of which are targeted at the difficulty of obtaining legal representation for low-income tenants.[3]  One such group is the South Carolina NAACP, a nonprofit membership organization chartered in 1939 that advocates for South Carolinians' rights, including access to housing justice.  Among other initiatives, the organization provides free services to low-income tenants facing evictions by pairing them with trained volunteers that connect tenants with lawyers who provide rental assistance and legal representation. ECF No. 11, Campbell Decl. ¶ 4.  But there is a dearth of attorneys who can provide no-cost legal services.  ECF No. 8, Chambliss Decl. ¶ 12.  Meanwhile, the South Carolina NAACP claims that with training, its volunteers are able to provide tenants with basic advice on requesting a hearing and exercising their rights.  See ECF No. 11, Campbell Decl. ¶ 15.  As a solution, the South Carolina NAACP developed the framework for a program that it claims can help close the access-to-justice gap that has engendered South Carolina's deplorably high eviction rates.  The South Carolina NAACP seeks to train and

---

[1] Eviction Lab, Top Evicting Small Cities and Rural Areas in the United States, https://perma.cc/B86P-9PGJ (last accessed August 2, 2023).  Princeton University's Eviction Lab compiled rankings based on data from 2016.  According to the Eviction Lab's website, most state governments do not collect eviction data, so eviction records can be difficult to access and compile.

[2] Joseph P. Williams, Communities With the Highest Eviction Rates, U.S. News & World Report (Sept. 30, 2020), https://www.usnews.com/news/healthiest-communities/slideshows/counties-with-the-highest-eviction-rates-in-the-us?onepage.

[3] See UNCG Center for Housing & Community Studies, South Carolina Legal Needs Assessment 2022 at 97–100 (Feb. 21, 2023), https://perma.cc/C6CN-9734 (gathering responses from community leaders and members about solutions for improving legal access).

supervise "Housing Advocates"—volunteers who "are well versed in the legal process of evictions but are not lawyers." ECF No. 4-1 at 5. The program would train and certify Housing Advocates to provide three general services:

> (1) confirm that the tenant they are helping has an eviction action filed against them; (2) advise the tenant that they should request a hearing and, based on the text of the eviction notice and checking relevant court records, explain how and when to do so; and (3) provide the tenant with narrow additional advice about the hearing by flagging certain defenses the tenant might be able to raise.

ECF No. 1, Compl. ¶ 45 (citing proposed Housing Advocate training manual).

Although the South Carolina NAACP has developed a training program, it has not implemented the program. According to the organization, the program would require Housing Advocates to provide limited legal advice. As a result, the South Carolina NAACP fears that the program would cause its Housing Advocates, who are not lawyers, to run afoul of South Carolina's rules on the unauthorized practice of law ("UPL"). South Carolina law provides:

> No person may either practice law or solicit the legal cause of another person or entity in this State unless he is enrolled as a member of the South Carolina Bar pursuant to applicable court rules, or otherwise authorized to perform prescribed legal activities by action of the Supreme Court of South Carolina.

S.C. Code Ann. § 40-5-310 (the "UPL statute").

As contemplated by the statute, the South Carolina Supreme Court "regulate[s] the practice of law in South Carolina," including delineating what is and is not the practice of law. See In re Unauthorized Practice of Law Rules Proposed by S.C. Bar, 422 S.E.2d 123, 124 (S.C. 1992). Instead of attempting to form "a comprehensive definition" of "practice of law," the South Carolina Supreme Court generally "decide[s] what is and what is not the unauthorized practice of law in the context of an actual case or

controversy." Id.  A person who is determined to have engaged in UPL may be guilty of a felony, punishable by up to five years of imprisonment and $5,000 in fines.  S.C. Code § 40-5-310.

Plaintiffs—who consist of the South Carolina NAACP and individual plaintiffs who are seeking to become Housing Advocates—brought the instant action on March 21, 2023.  Claiming to face a "threat of prosecution," ECF No. 4-1 at 9, plaintiffs also filed a motion for a preliminary injunction on March 21, 2023, ECF No. 4.  On May 3, 2023, Wilson filed a motion to dismiss or, in the alternative, motion to stay, which doubled as a response to the motion for preliminary injunction.  ECF No. 35.  Plaintiffs responded to the motion to dismiss, which doubled as a reply in support of their motion for preliminary injunction, on May 17, 2023, ECF No. 38.  Wilson replied in support of his motion to dismiss on May 31, 2023.  ECF No. 41.  The court held a hearing on both motions on August 8, 2023.  ECF No. 63.  As such, both motions have been fully briefed and are now ripe for review.

## II.   DISCUSSION

Plaintiffs seek "a preliminary injunction that would allow them to provide limited legal advice, under the supervision of the South Carolina NAACP, without the threat of prosecution for the unauthorized practice of law."  ECF No. 4-1 at 12.  In lieu of arguing that plaintiffs are not entitled to an injunction,[4] Wilson moves to dismiss the complaint based on lack of standing and ripeness.  Since justiciability is a threshold matter, the

---

[4] While Wilson's motion is framed in the alternative as a response to plaintiffs' motion for preliminary injunction, the response portion essentially transposes the arguments from the motion to dismiss to argue that plaintiffs have not demonstrated irreparable harm.  Wilson does not otherwise engage the merits of plaintiffs' First Amendment claims.

4

court addresses Wilson's motion to dismiss first and ultimately denies the motion. The court then turns to Wilson's alternative motion to stay, which the court grants. Since the court finds that this action should be stayed, the court finds that the motion for preliminary injunction is mooted.

### A. Standing

"[T]he irreducible constitutional minimum of standing contains three elements." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). First, a plaintiff must demonstrate an "injury-in-fact," which is a "concrete and particularized . . . invasion of a legally protected interest." Id. Second, "there must be a causal connection between the injury and the conduct complained of, meaning that the injury must be "fairly . . . trace[able] to the challenged action of the defendant." Id. Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. The plaintiff bears the burden of proving that standing exists. Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., 523 F.3d 453, 459 (4th Cir. 2008). If a plaintiff does not prove it has Article III standing, the court must dismiss the action for lack of subject matter jurisdiction. See Middleton v. Andino, 488 F. Supp. 3d 261, 278 (D.S.C. 2020), appeal dismissed as moot, 2020 WL 8922913 (4th Cir. Dec. 17, 2020) ("Standing implicates the court's subject matter jurisdiction and is governed by Federal Rule of Civil Procedure 12(b)(1).").

Wilson argues that plaintiffs cannot prove an injury-in-fact or a causal connection between the injury and the conduct complained of because plaintiffs never sought authorization for their program from the South Carolina Supreme Court before filing this action. ECF No. 35-3 at 8. Stated another way, Wilson claims that because South

Carolina law provides plaintiffs with an avenue for seeking authorization for limited practice of law by non-lawyers—and plaintiffs have not elected to seek such authorization—they cannot claim that they were injured by said law.

In response, plaintiffs argue that it is unnecessary for plaintiffs to expose themselves to the threatened injury—i.e., criminal prosecution—for them to challenge a statute that deters the exercise of their constitutional rights. ECF No. 38 at 3 (citing Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). According to plaintiffs, the rule is particularly apt for First Amendment challenges, where a plaintiff may show an injury-in-fact through the chilling of free speech. Id. (citing Cooksey v. Futrell, 721 F.3d 226, 237 (4th Cir. 2013)).

The court finds that plaintiffs have standing to challenge the UPL statute. Plaintiffs correctly assert that "standing requirements are somewhat relaxed in First Amendment cases" as courts have recognized a special interest in allowing a statute to be challenged when it chills free speech. Cooksey, 721 F.3d at 235 (citing Sec'y of State of Md. v. Joseph H. Munson Co., Inc., 467 U.S. 947, 956 (1984)). Consequently, a plaintiff may bring a pre-enforcement challenge to a statute or regulation by showing that it results in self-censorship. Id. Importantly however, the claimed chilling effect cannot be based on "[s]ubjective or speculative accounts." Benham v. City of Charlotte, 635 F.3d 129, 135 (4th Cir. 2011). Instead, "[a]ny chilling effect must be objectively reasonable," meaning "it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." Id.

Here, plaintiffs have shown that the UPL statute has a non-speculative and reasonable chilling effect on their speech. Defendants Winchester, Neal, and Campbell—

who all seek to become Housing Advocates—stated in some variation that they have deliberately refrained from providing the advice that they would be offering through the program due to a belief that their advice would be prohibited. See ECF No. 7, Winchester Decl. ¶ 10 ("I know that South Carolina's ban on the unauthorized practice of law limits the advice I can share with tenants."); ECF No. 10, Neal Decl. ¶ 16 ("I'm not allowed to have all the tools because of South Carolina's broad prohibition on the unauthorized practice of law."); ECF No. 11, Campbell Decl. ¶ 12 ("Because I know that I can't engage in the practice of law, sometimes I'm very nervous about even providing nonlegal advice to tenants if they have a pending eviction action.").

      Wilson suggests that plaintiffs' reliance on the First Amendment to prove standing is misplaced since they are bringing an as-applied challenge to the UPL statute, not facially challenging the law. ECF No. 35-3 at 10. Wilson appears to argue that any leeway provided for First Amendment claims ought not apply when a plaintiff brings an as-applied challenge. But none of the cases referenced above, including Cooksey, specifically distinguished as-applied from facial challenges in this context. See, e.g., Cooksey, 721 F.3d at 234–37. Assuming, without deciding, that Wilson is correct about the distinction, the court nevertheless finds that plaintiffs have established standing. In general, a plaintiff who faces a "credible threat of prosecution under a criminal statute [] has standing to mount a pre-enforcement challenge to that statute." N.C. Right to Life, Inc. v. Bartlett, 168 F.3d 705, 710 (4th Cir. 1999) (citation omitted). Plaintiffs assert that because S.C. Code § 40-5-310 makes it a felony to engage in UPL, they have proven that they have standing based on a credible threat of prosecution. The Fourth Circuit has not provided a precise definition of "credible threat of prosecution," but three circumstances

7

help determine whether that standard is met: (1) whether the state has "threatened prosecution for the supposedly proscribed conduct"; (2) whether plaintiffs have offered "evidence of the law having been enforced as they fear"; and (3) whether the plaintiffs have provided a "concrete intention to (arguably) violate" the statute at issue. See Md. Shall Issue, Inc. v. Hogan, 971 F.3d 199, 218 (4th Cir. 2020) (deriving the circumstances from prior Supreme Court opinions deciding whether plaintiffs may bring a pre-enforcement challenge consistent with Article III standing requirements).

To be sure, Wilson, as the Attorney General, has not announced an intention to prosecute plaintiffs if they were to implement the Housing Advocate program. But notably, the Attorney General has not specifically disavowed enforcement of the UPL statute against plaintiffs either and declined to do so at the hearing on this motion. Cf. Upsolve, Inc. v. James, 604 F. Supp. 3d 97, 106–07 (S.D.N.Y. 2022) (finding it relevant that the New York Attorney General declined to disavow enforcement of New York's UPL statute at oral argument). More importantly, the other factors suggest that a credible threat of enforcement exists here. Plaintiffs offer evidence—South Carolina Supreme Court decisions—where the Court found non-lawyers liable for violating UPL laws when they provided individuals with (arguably) basic legal advice. See Doe v. Condon, 532 S.E.2d 879, 882 (S.C. 2000) (adopting referee's finding that a paralegal who seeks to conduct educational seminars on wills and trusts engages in unauthorized practice of law); Linder v. Ins. Claims Consultants, Inc., 560 S.E.2d 612, 621 (S.C. 2002) (holding that a public insurance adjuster company engaged in the unauthorized practice of law when it advised the plaintiff on matters related to policy interpretation and settlement). Although none of the cases cited by plaintiffs are direct analogs, there is enough history

of prosecution that would cause a reasonable person in the individual plaintiffs' shoes to fear the same disposition. See also Housing Auth. of City of Charleston v. Key, 572 S.E.2d 284, 285 (S.C. 2002) (holding that a paralegal engaged in UPL by preparing pleadings on behalf of evicted tenants). Under the final factor, the South Carolina NAACP has already prepared a training manual for its Housing Advocate program, providing evidence that it has a "concrete intention" to engage in the speech that it claims is being chilled. Based on the evidence, the court finds that plaintiffs face a credible threat of prosecution and have standing to bring a pre-enforcement challenge.

Wilson argues that without first seeking authorization from the South Carolina Supreme Court, plaintiffs do not have standing to sue. In support, they cite a line of Second Circuit cases where courts purportedly required plaintiffs to first submit to licensure under a challenged policy before bringing suit. ECF No. 35-3 at 8–9 (citing Prayze FM v. F.C.C., 214 F.3d 245, 251–52 (2d Cir. 2000); Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir. 1997)). But the same circuit where those decisions were issued later confirmed that a plaintiff could "bring a pre-enforcement challenge to a statute by alleging 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, [with] a credible threat of prosecution thereunder.'" Brokamp v. James, 66 F.4th 374, 388 (2d Cir. 2023).[5] The Second Circuit in Brokamp distinguished the prior cases that required a license application by explaining

---

[5] The Fourth Circuit has reached the same holding. It upheld a district court decision that held that a plaintiff had standing based on a credible threat of prosecution under North Carolina's UPL statutes. Cap. Associated Indus., Inc. v. Stein, 922 F.3d 198, 204 n.2 (4th Cir. 2019). The district court, in turn, had determined that the plaintiff did not need to face pending prosecution to assert an injury, and that its injury was traceable to the state prosecutors. Cap. Associated Indus., Inc. v. Stein, 283 F. Supp. 3d 374, 381 (M.D.N.C. 2017).

that there is no such requirement when a plaintiff's "injury arises from the very fact of a licensure requirement which presently silences [the plaintiff]—under pain of criminal prosecution—from engaging in the professed protected speech." Id. That principle applies here. Plaintiffs could, in theory, provide the eviction guidance to tenants now; no regime outright denies them from engaging in that speech. But plaintiffs argue they are presently being chilled from engaging in that speech. Thus, this is not a case where there is no legally cognizable injury until the denial of an application. As such, the court finds that plaintiffs have adequately alleged standing.

### B. Ripeness

The doctrine of ripeness exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Lab'ys v. Gardner, 387 U.S. 136, 148 (1967), abrogated on other grounds by statute, Pub. L. 94-574, 90 Stat. 2721, as recognized in Califano v. Sanders, 430 U.S. 99, 105 (1977). It "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 58 (1993). In considering whether a dispute is ripe for review, the court must consider: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. Deal v. Mercer Cnty. Bd. of Educ., 911 F.3d 183, 191 (4th Cir. 2018) (citing Cooksey, 721 F.3d at 240).

Wilson argues that this case is not ripe because plaintiffs have not yet applied for or implemented their Housing Advocate program, so there is no risk of injury. If Wilson's arguments about the existence of a ripe controversy seem interrelated with his arguments on standing, it is because they are. "Ripeness and standing are related

10

concepts that are not entirely distinct" and "'in practice there is an obvious overlap between' the two doctrines." Wild Va. v. Council on Env't Quality, 544 F. Supp. 3d 620, 633 (W.D. Va. 2021) (quoting South Carolina v. United States, 912 F.3d 720, 730 (4th Cir. 2019)).

For similar reasons raised under the discussion of standing, the court finds that the case is sufficiently ripe for review. Again, a litigant is not required "to expose himself to liability before bringing suit to challenge the basis" of a threat of prosecution. MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128–29 (2007). The same principle applies in the context of ripeness. See id. at 128 n.8 (noting that the discussion of justiciability for pre-enforcement declaratory judgment actions applied for both standing and ripeness); Cooksey, 721 F.3d at 226 ("Much like standing, ripeness requirements are also relaxed in First Amendment cases.") (citation omitted). This means that for plaintiffs' First Amendment challenges, the fundamental question is whether plaintiffs have shown that the UPL restrictions "to which they are currently subject . . . require them to self-censor." Edgar v. Haines, 2 F.4th 298, 311 (4th Cir. 2021). If plaintiffs have plausibly shown that the UPL statute led to self-censorship or chilling of free speech, then deciding the issue of ripeness "does not require [the court] to interpret" the statute in the abstract because the court is instead "called to decide what conduct [] plaintiffs' 'can engage in without threat of penalty.'" Id. (quoting Va. Soc'y for Hum. Life, Inc. v. FEC, 263 F.3d 379, 390 (4th Cir. 2001)).

The cases cited by Wilson are not to the contrary. In one case, the Seventh Circuit affirmed a district court decision holding that an action seeking a declaration that a nonlawyer had a First Amendment right to engage in certain advocacy notwithstanding

11

a UPL statute was unripe. Wisc.'s Env't Decade, Inc. v. State Bar of Wisc., 747 F.2d 407, 411 (7th Cir. 1984). But as the Seventh Circuit cautioned, the difference between cases calling for advisory opinions and those that are ripe "is one of degree, not discernible by any precise test." Id. at 410–11 (citing Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 297 (1979)). The court determined that the claims in State Bar of Wisconsin were unripe based on unique circumstances that were presented in that case. For instance, the State Bar of Wisconsin had already known of the plaintiff's activities "for over ten years," yet never took any formal steps to institute proceedings. Id. at 412. Moreover, in the only Wisconsin cases resembling the plaintiff's case, no criminal or civil penalties were ever imposed, further diminishing the reasonable fear of criminal prosecution. Id. Here, however, plaintiffs appear to have brought this action only once the structure of the Housing Advocate program was in place, undergirding the notion that they have not implemented it due to a genuine fear of prosecution. Additionally, the South Carolina cases cited by plaintiffs—again, while not identical to the instant case—support their assertion that there is a credible risk of prosecution. Under the first factor for testing ripeness, plaintiffs' claims are fit for judicial determination.

Plaintiffs have also adequately shown that refusing to reach their claims now would cause them material hardship. Plaintiffs have developed a Housing Advocate Eviction Advice Training Manual. They have drafted forms and scripts for the Housing Advocates to follow. ECF No. 1-1 at 18–20. There are volunteers who are willing to begin training to provide the advice at issue, and they are allegedly precluded from doing so based on the UPL restrictions. See ECF No. 10, Neal Decl. ¶ 18 ("If [the training]

12

were offered, I would sign up to receive it as soon as possible."). Based on those considerations, the court finds that the second factor has been met and that the claims are ripe for adjudication.

### C. Motion to Stay/Abstention

Whether the court can hear the case is different from whether it should. In the alternative, Wilson argues that the court should abstain from deciding any issues relating to whether the activity at issue constitutes UPL until the South Carolina Supreme Court has had an opportunity to hear a declaratory judgment action or otherwise weigh in. Specifically, Wilson argues that if the court does not dismiss the action for lack of standing and ripeness, the court should at least abstain from deciding the case under the Pullman abstention doctrine.

"Pullman abstention applies where 'there is (1) an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is potentially dispositive.'"[6] Wise v. Circosta, 978 F.3d 93, 101 (4th Cir. 2020) (quoting Educ. Servs., Inc. v. Md. State Bd. for Higher Educ., 710 F.2d 170, 174 (4th Cir. 1983)). If a district court determines that the doctrine applies, it "should retain jurisdiction over the case, but stay the proceedings so that state courts can rule on the state law question." Nivens v. Gilchrist, 444 F.3d 237, 245–46 (4th Cir. 2006) (citing England v. La. State Bd. of Med.

---

[6] Pullman abstention is distinguishable from Younger abstention. Pullman abstention "involves an inquiry focused on the possibility that the state courts may interpret a challenged state statute," while Younger abstention "relate[s] to the State's interest in pursuing an ongoing state proceeding." Ohio Bureau of Emp. Servs. v. Hodory, 431 U.S. 471, 477 (1977) (emphases added). Pullman abstention is thus properly applied here.

13

Examiners, 375 U.S. 411, 416 (1964)). If the state court ultimately fails to resolve the issue, "the parties may then return to federal court for a ruling on the constitutional issue." Id.

Wilson argues that Pullman abstention applies regardless of how this court rules on standing and ripeness because "[s]tate law is most certainly unsettled." ECF No. 35-3 at 15. Additionally, Wilson argues that under principles of comity, this court should respect the processes of the South Carolina Supreme Court, which allow individuals to seek determinations on whether their conduct may be authorized through declaratory judgments. Id. In response, plaintiffs note that "Pullman abstention is limited to 'special circumstances' where there is substantial uncertainty as to the meaning of a state law and where the state courts have a reasonable probability of interpreting the law in such a manner as to avoid any constitutional issue." S. Carolinians for Responsible Gov't v. Krawcheck, 2009 WL 10713347, at *8 (D.S.C. Mar. 25, 2009) (citing Kusper v. Pontikes, 414 U.S. 51, 54–55 (1973)). Upon review, the court finds that those special circumstances are presented in this case such that the doctrine is properly applied.

Plaintiffs argue that under the first prong of the test, this case does not present an unclear question of state law because in the South Carolina Supreme Court's extended history of deciding UPL cases, the Court "has left no significant doubt that the State's UPL prohibition covers the activities proposed by Plaintiffs." ECF No. 38 at 16. The court disagrees. It is certainly true, as highlighted in the standing discussion, that there have been cases where the South Carolina Supreme Court adjudged nonlawyers to be in violation of the UPL statute for providing limited legal advice. See supra II.A. at 8–9. At the same time, Wilson points out that there have also been cases where the South

14

Carolina Supreme Court authorized requests for unlicensed individuals to perform limited legal services. ECF No. 35-3 at 4 (collecting cases).

Plaintiffs respond that Wilson's cases are inapposite because they were (1) "particularly context-specific," (2) dealt with scenarios that involved the help of licensed attorneys, and/or (3) did not actually involve giving advice on matters of law. ECF No. 38 at 7. But plaintiffs' cited cases are arguably just as distinguishable. None of plaintiffs' cases deliver certainty that the South Carolina NAACP's program would be prohibited as UPL because the Court in those cases did not deal with near-identical facts. Indeed, some of the same cases that plaintiffs cite reference the difficulty in ascertaining whether conduct constitutes unauthorized practice of law. See Linder, 560 S.E.2d at 617 ("Often, the line between such activities and permissible business conduct by non-attorneys is unclear."); Condon, 532 S.E.2d at 881 ("The line between what is and what is not permissible conduct by a non-attorney is sometimes 'unclear' . . . .") (citing State v. Buyers Serv. Co., Inc., 357 S.E.2d 15, 17 (S.C. 1987)).[7] It is unsurprising that the South Carolina Supreme Court thus aims to "decide what is and what is not the unauthorized practice of law in the context of an actual case or controversy." In re Unauthorized Practice of Law, 422 S.E.2d at 124.

Moreover, even if plaintiffs are correct that their conduct would constitute UPL under existing law, the South Carolina Supreme Court has the capacity to determine

---

[7] If the parties' competing authorities were not enough, both parties cite the same case in an attempt to pull the rope over their line. See Franklin v. Chavis, 640 S.E.2d 873 (S.C. 2007) (cited at ECF No. 35-3 at 4 and ECF No. 38 at 6). In Franklin, the South Carolina Supreme Court held that a non-lawyer engaged in UPL by drafting a will and power of attorney for his neighbor but did not engage in UPL by drafting probate forms. Id. at 876–77. The law is clearly unsettled if both parties can cite the same case for the opposite conclusion.

whether individuals may otherwise obtain authorization to practice.  As Wilson notes, South Carolina's UPL statute is unique in that it specifically contemplates situations where individuals who are not members of the South Carolina Bar may otherwise obtain authorization "to perform prescribed legal activities by action of the Supreme Court of South Carolina."  S.C. Code § 40-5-310.  On this issue, plaintiffs claim that any argument about the Supreme Court's capacity to determine special authorization requests is forward-looking and does not inform whether state law is historically unclear.  ECF No. 38 at 17.  According to plaintiffs, if the court allowed Wilson to argue that uncertainty over authorization rendered this an unsettled area of law, all cases would effectively involve "unsettled" state law since rulings could later be reversed, and Pullman abstention would be the rule rather than the exception.  Id.  Plaintiffs' argument is well-taken but not ultimately germane here.  The court is not suggesting that the South Carolina Supreme Court might later "reverse course."  Id.  Rather, the provision providing for authorization by the South Carolina Supreme Court is embedded in South Carolina's UPL statute, and there is uncertainty over how the Court has and will apply that provision.  Stated another way, if the South Carolina Supreme Court does end up granting plaintiffs authorization, the court would not read such a decision as one that rewrites prior precedent; rather, it would be an interpretation of the South Carolina Supreme Court's own precedent and of the state's rules on the practice of law.  Because the state law issue of whether plaintiffs' program would be authorized is unclear, the court finds that the first prong of Pullman abstention has been met.

   The second prong asks whether resolution of the state law question is "potentially dispositive."  Wise, 978 F.3d at 102 (quoting Educ. Servs., 710 F.2d at 174).  In other

words, Pullman abstention is appropriate where the resolution of an issue concerning state law would moot the constitutional questions presented. Id. (citation omitted). This prong is satisfied here. Should the South Carolina Supreme Court ultimately determine that plaintiffs are allowed to provide guidance under the Housing Advocate program without running afoul of the UPL statute or that they may provide limited advice under special circumstances, the issue of whether that activity is protected speech becomes moot. Further, there is limited risk of the South Carolina Supreme Court deciding issues of constitutional law while this case is stayed because the resolution of the state law issues that would be presented to the Supreme Court do not require consideration of the First Amendment issues presented in this case.

Finally, beyond the two prongs discussed above, courts should consider the "dual aims" of the Pullman abstention doctrine—"avoiding advisory constitutional decisionmaking" and "promoting the principles of comity and federalism." Id. Those aims are clearly met here. The South Carolina Supreme Court has original and exclusive jurisdiction to hear cases deciding whether conduct constitutes the practice of law. The Supreme Court specifically encourages interested individuals "to bring a declaratory judgment action in this Court's original jurisdiction to determine the validity of the conduct." In re Unauthorized Practice of Law, 422 S.E.2d at 125. Plaintiffs respond that while the Supreme Court has indicated such a preferred approach, the law imposes no exhaustion requirement. According to plaintiffs, the South Carolina Supreme Court only invites parties to file actions in its original jurisdiction to determine whether their conduct would involve UPL, and furthermore, they have not extended that invitation to requests for special authorization. ECF No. 38 at 10. But this distinction appears tenuous at best.

In In re Unauthorized Practice of Law, the State Supreme Court noted its practice of allowing nonlawyers to represent businesses in civil magistrate court proceedings, authorized persons to represent clients before agencies, and certified public accountants to render professional assistance, including before agencies and the probate court. 422 S.E.2d at 124–25. The Court has historically been called upon to make determinations of special authorization. 422 S.E.2d at 124–25.

Wilson also provides extrinsic documents to further show that the Supreme Court has original jurisdiction over special authorization requests. For example, Wilson attaches a letter submitted by the South Carolina Board of Paralegal Certification to the South Carolina Supreme Court in which the organization proposed role expansions for paralegals which would not require attorney supervision. ECF No. 35-1 at 7. The South Carolina Supreme Court accepted the letter for consideration. In response, plaintiffs argue that the Clerk of the Supreme Court had merely stated that such letters "may be addressed in the original jurisdiction of the Supreme Court," making the proposition far from certain. ECF No. 38 at 10 (citing ECF No. 35-1 at 5 ¶ 10). Even in the absence of definitive language, the court considers the preferences outlined by the State Supreme Court to be strongly indicative of that Court's preferred method of adjudication.[8]

---

[8] Wilson also references and attaches a report titled "Measuring South Carolina's Justice Gap," which was prepared by the South Carolina Access to Justice Commission (the "Commission"). See generally ECF No. 35-2. The Commission was created by the State Supreme Court. Id. at 7. Plaintiffs argue that the report does not prove that the South Carolina Supreme Court is likely to grant plaintiffs special authorization because although the Supreme Court authorized the report, the Commission was the one that prepared it. ECF No. 38 at 10 n.3. A fair reading of the report indicates that the State Supreme Court is open to solutions that would increase access to justice, see id. at 6, 11, but the court agrees that the report does not shed additional light on the Court's actual authority to hear requests like the one that plaintiffs would theoretically submit.

18

In short, plaintiffs have provided no reason to suggest that exercising jurisdiction prior to a State Supreme Court ruling would be anything but a "needless federal intervention into local affairs." Pustell v. Lynn Pub. Schs., 18 F.3d 50, 53 (1st Cir. 1994). The court therefore abstains from ruling on any issues in this case and stays the case until the South Carolina Supreme Court has had an opportunity to issue a decision on plaintiffs' Housing Advocate project.

### D. Preliminary Injunction

Plaintiffs argue against abstention but further argue that if the court were to ultimately stay this case, the court should still grant them preliminary injunctive relief. According to plaintiffs, a federal court may provide interim relief to a party while a case is stayed. ECF No. 38 at 20 (citing 17A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 4243 (3d ed. 2022)) (other citations omitted).

The court declines to contemporaneously stay the case and grant plaintiffs a preliminary injunction. Without engaging in an analysis of the preliminary injunction factors, the court notes that plaintiffs are asking for a mandatory preliminary injunction,[9] and the standard for issuing such injunctive relief is even more exacting. See Vollette v. Watson, 2012 WL 3026360, at *3 (E.D. Va. July 24, 2012) ("The [preliminary injunction standard] becomes even more exacting when a plaintiff seeks a preliminary injunction that mandates action, as contrasted with the typical form of preliminary injunction that

---

[9] As opposed to mandatory preliminary injunctions, "prohibitory injunctions aim to maintain the status quo," which is defined as the "last uncontested status between the parties which preceded the controversy." Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013). Here, the "status quo" entails the pendency of plaintiffs' program until its validity can be determined.

merely preserves the status quo pending trial.") (emphasis in original). In conjunction, under principles of comity, federal courts must be guided by "scrupulous regard for the rightful independence of state governments." Nat'l Cap. Naturists, Inc. v. Bd. of Supervisors of Accomack Cnty., 878 F.2d 128, 132 (4th Cir. 1989). The court is determined not to rule on the preliminary injunction and risk mandating action in a way that would prematurely step into the exclusive province of the State Supreme Court. The court thus declines to consider the motion for preliminary injunction at this stage.

While the court cannot order plaintiffs to file a separate action, the court advises plaintiffs that in the interest of assisting the people of South Carolina in the manner they have outlined, plaintiffs' best course of action would be to file a case in the South Carolina Supreme Court pursuant to the Court's original jurisdiction. Until then, this court must "stay its hands" until the "constitutional issue . . . [is] mooted or presented in a different posture." Growe v. Emison, 507 U.S. 25, 32 (1993) (cleaned up).

### III.  CONCLUSION

For the reasons set forth above, the court **DENIES** the motion to dismiss, **GRANTS** the motion to stay, and finds as **MOOT** the motion for preliminary injunction.

**AND IT IS SO ORDERED.**

DAVID C. NORTON
UNITED STATES DISTRICT JUDGE

**August 14, 2023**
**Charleston, South Carolina**